UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 11-10195-RWZ

UNITED STATES OF AMERICA

v.

MATTHEW M. HEINECKE

MEMORANDUM OF DECISION

February 20, 2013

ZOBEL, D.J.

The government's superseding indictment in this case names fifteen defendants in eleven counts. The charges stem from an extended investigation into an alleged criminal conspiracy to distribute large amounts of illegal drugs. Defendant Matthew M. Heinecke (hereinafter "defendant") is named only in the first count of the indictment, which charges him and seven others with a conspiracy to distribute oxycodone, cocaine, and more than one thousand kilograms of marijuana.

Defendant now moves to suppress evidence discovered during a search of his residence. The court has held an evidentiary hearing and considered the materials submitted by defendant and by the government,. Based on the evidence and the arguments presented, I find the following facts and deny defendant's motion.

I. **Findings of Fact**

A. **The Warrant Application**

As part of their investigation into the alleged drug distribution conspiracy,

government agents sought a warrant to search the house located at 19 Sylvan Street in Boylston, Massachusetts. They believed that house was the primary residence of a suspect named Jeffrey Spinks. The affidavit submitted in support of the warrant application provided the following information to establish probable cause for the search:

First, agents intercepted telephone calls on February 9 and 10, 2011, between suspected drug dealers Safwan Madarati and Vartan Soukiasian indicating that Soukiasian would distribute forty pounds of marijuana to Spinks.

Second, on April 13, 2011, agents intercepted more telephone calls between Madarati and Soukiasian indicating that Spinks would shortly pick up another forty pounds of marijuana from Soukiasian. An officer then observed Spinks arrive at Soukiasian's house in Watertown, Massachusetts, driving a green Jeep Cherokee. About fifteen minutes later, Spinks left Soukiasian's house driving the same Jeep Cherokee. He drove along the Massachusetts Turnpike to a rest area, where he stopped and ate at a McDonald's; he then continued driving to 19 Sylvan Street. An officer saw Spinks park at that address, and later saw him leaving the garage attached to the house with an unidentified object in his hand.

Third, agents believed that 19 Sylvan Street was Spinks' residence based on the information Spinks had given to the Massachusetts Registry of Motor Vehicles. The affidavit further indicated, based on the affiant's training and his experience with numerous drug investigations, that drug traffickers often store their drugs and other drug-related materials at their residences.

2

Finally, the affidavit included a section titled "Intercepted Calls Regarding Collection of Debt in Florida," describing (inter alia) several intercepted telephone calls relating to Spinks. In one such call, according to the affiant, "Spinks and Soukasian talked about how Spinks and two other men attempted to collect a Porsche from a male in Florida identified as Kevork Apkarian." Docket # 1, Ex. 1 ("Affidavit"), ¶ 58 (capitalization altered).

The government submitted its application for a warrant on April 20, 2011, a week after the agents observed Spinks driving from Soukiasian's house to 19 Sylvan Street. The warrant was issued on the same day, and the government set out to execute it that evening.

### B. The Search

A team of twelve to fifteen federal agents and local police officers (collectively "agents") worked together to execute the search warrant. They arrived at 19 Sylvan Street at about 9:00 pm on April 20, 2011. The agents knocked at the front door, which was locked, and announced that they were law enforcement personnel with a search warrant. Looking through the front window, the agents saw defendant come out of the house's kitchen, walk towards the front door, and then stop and return to the kitchen. At that point, the agents broke down the front door and conducted a security sweep of the house. The agents found both defendant and Spinks in the kitchen, along with two clear plastic bags of marijuana in plain view on the kitchen counter and a half-open black plastic garbage bag containing several pounds of marijuana on the floor. There were no other individuals in the house.

The agents handcuffed defendant and Spinks and read them their <u>Miranda</u> rights. Several agents then remained with defendant and Spinks in the kitchen while the others began searching the house. The agents who remained with defendant and Spinks engaged them in conversation, asking defendant who he was and what he was doing in the house. Defendant identified himself and explained that he was the current resident of 19 Sylvan Street and had been renting the home from Spinks for the past month. Following defendant's directions, the agents found the lease agreement in a drawer in the kitchen. The lease listed Spinks and his wife as landlords of 19 Sylvan Street and defendant as the sole tenant. By its terms, the lease ran from March 5, 2011 (about a month before the search) to March 4, 2012. The agents asked defendant how much marijuana was in the bags in the kitchen, and defendant replied he did not know because Spinks had just brought the bags in.

Meanwhile, the agents continued their search, finding a safe in the corner of a closet in the master bedroom. Inside the safe was a total of $102,525 in cash. The agents also found a substantial amount of marijuana inside cardboard boxes in the trunk of an old Volvo in the garage, and a handgun, currency, and drug paraphernalia in a furnished room in the basement.[1]

## II.   Analysis

Defendant moves to suppress all of the evidence discovered by the search. He raises four arguments in support of that motion. First, he seeks a <u>Franks</u> hearing,

---

[1] It appears that the furnished basement room was rented by a third party. The government conceded at oral argument that defendant did not own the handgun found there.

4

claiming the warrant application falsely represented that Spinks was involved in extorting a Porsche from an individual named Kevork Apkarian. Second, he argues that the warrant was facially invalid because the agents lacked probable cause to believe evidence would be found at 19 Sylvan Street. Third, he argues that even if the warrant were facially valid, the agents were required to stop searching and seek a new warrant once they learned Heinecke and not Spinks was the current resident of the house. Fourth, he argues that the information in the warrant affidavit was stale.

**A. Franks Hearing**

In Franks v. Delaware, 438 U.S. 154 (1978), the Supreme Court held that a criminal defendant may obtain an evidentiary hearing to challenge the sufficiency of an executed warrant if he can make a substantial showing that the affidavit supporting the warrant included deliberately or recklessly false statements. A defendant seeking a Franks hearing faces a heavy burden. The affidavit supporting the warrant bears a presumption of validity; to overcome it, the defendant must make "allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." Id. at 171. Even if the defendant is able to make a substantial showing that false statements were included in the affidavit, the warrant remains valid and no hearing is required if the affidavit still shows probable cause once the false statements are excluded. Id. at 172. Given these exacting standards, "a defendant must meet a high bar even to get a Franks hearing in the first place." United States v. Tzannos, 460 F.3d 128, 136 (1st Cir. 2006).

Defendant fails that high bar. His claim is that the affidavit falsely alleged Spinks

5

was involved in extorting a Porsche from Kevork Apkarian. But the relevant section of the affidavit never directly charges Spinks with extortionate activity. Instead, it describes the contents of several intercepted phone calls: one between two other suspects named Hagop ("Jack") Sarkissian and Vartan Soukiasian, one between Spinks and Soukiasian, and one between Spinks and Massachusetts police officer Brian Connors. Defendant asserts that the affidavit describes these phone calls in a misleading way to create the impression that Spinks was involved in an extortion scheme. To support that assertion, defendant has submitted the government's draft transcriptions of the intercepted conversations, and also other affidavits that the government prepared while seeking authorization for investigative wiretaps. Defendant claims that the transcriptions and wiretap affidavits differ in important ways from the supporting affidavit at issue.

I have carefully reviewed the materials defendant has submitted, and finds no reason to believe that the supporting affidavit contained any deliberately or recklessly false information. Most of the discrepancies pointed out by the defendant are immaterial. There is only one questionable statement included in the supporting affidavit: that "Spinks and Soukiasian talked about how Spinks and two other men attempted to collect a Porsche from a male in Florida named Kevork Aparkian." Affidavit ¶ 58. In fact, the transcription indicates only that Soukiasian and Spinks discussed how Soukiasian would deliver the Porsche to Spinks, without any discussion of whether Spinks was involved in any extortion.

That discrepancy does not raise the serious concerns of deliberate

misrepresentation that would require a Franks hearing. Taken as a whole, the affidavit is not misleading. It squarely quotes Spinks' comment that Spinks himself was a victim of Sarkissian's extortion, a comment that defendant relies on to show that Spinks was not involved in the extortionate activity. Furthermore, the error asserted here does not imply deliberate or reckless falsity as opposed to negligence. See Franks, 438 U.S. at 171 ("Allegations of negligence or innocent mistake are not enough.") It is never easy to record and interpret intercepted conversations, and the transcriptions here are no exception; the supporting affidavit does not vary so widely from the transcription as to justify an inference of bad faith. And finally, as discussed next, the affidavit contained sufficient information to show probable cause even omitting the statements that defendant challenges. Defendant therefore is not entitled to a Franks hearing.

**B. Probable Cause**

Defendant next argues that the warrant was invalid because the supporting affidavit did not provide probable cause to search 19 Sylvan Street. The probable cause inquiry asks "whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). Where a neutral magistrate has already issued a warrant, the court gives that initial evaluation great deference, and will reject the warrant only if there is no substantial basis for concluding that probable cause existed. United States v. Hicks, 575 F.3d 130, 136 (1st Cir. 2009).[2]

---

[2] It is not clear whether that deference still applies when material portions of an affidavit are stricken for intentional misrepresentation. See United States v. Dessesaure, 429 F.3d 359, 368 n.8 (1st Cir. 2005). But as discussed above, defendant has not met his initial burden to show any intentional misrepresentation here.

The supporting affidavit here indicated that Spinks had twice purchased marijuana shipments from Soukiasian, once on February 10, 2011, and once on April 13, 2011. After the second occasion, agents observed Spinks returning from the alleged transaction to 19 Sylvan Street, stopping briefly at a McDonald's en route. The agents believed, based on the information Spinks provided to the Registry of Motor Vehicles, that 19 Sylvan Street was Spinks' residence; and they knew from their training and experience that drug dealers often keep drugs and evidence of drug transactions at their residences.

Defendant concedes that the affidavit showed probable cause to believe Spinks was involved in criminal activity, but argues there was no probable cause to believe evidence of that criminal activity would be found at 19 Sylvan Street. See United States v. Feliz, 182 F.3d 82, 88 (1st Cir. 1999) (warrant application must show "nexus" between crime and place to be searched). He emphasizes that the agents did not actually see Spinks loading or unloading marijuana at 19 Sylvan Street; that the affidavit did not allege Spinks had a history of dealing drugs or storing them in his home; and that no other information connected 19 Sylvan Street with illegal drug distribution.

As defendant correctly notes, the First Circuit has rejected the proposition that "in all criminal cases, there will automatically be probable cause to search a suspect's residence." Id. Instead, "[a]ll factors must be weighed in each case in order to assess the reasonableness of inferring that evidence of the crime can be found at the suspect's home." Id. Here, the circumstances described in the affidavit provided a

8

substantial basis for the magistrate judge's determination of probable cause. The intercepted conversations linked Spinks to two forty-pound marijuana purchases, establishing a fair probability that Spinks was storing drugs somewhere. Surveillance after the second transaction indicated that Spinks likely brought the marijuana back to 19 Sylvan Street, even if the agents did not actually observe him unloading it there. Cf. United States v. Ribeiro, 397 F.3d 43, 49-50 (1st Cir. 2005) (fact that suspect drove directly from his apartment to a drug sale supported finding probable cause to search the apartment). That conclusion was particularly plausible given that the agents believed 19 Sylvan Street was Spinks' residence. See id. at 50 ("[D]rug traffickers frequently use their homes for storing cash and records relating to their illicit activity."). Finally, the magistrate was entitled to consider the affiant's "experience and training in narcotics investigations," Hicks, 575 F.3d at 137, and to give some weight to his determination that 19 Sylvan Street probably contained relevant evidence.

This can fairly be described as a borderline case for probable cause. But "[i]n a doubtful or marginal case, the court defers to the issuing magistrate's determination." United States v. Barnard, 299 F.3d 90, 93 (1st Cir. 2002). Because the issuing magistrate found probable cause to search 19 Sylvan Street, and because the supporting affidavit provides a substantial basis for that determination, the warrant must be upheld.

In any case, the affidavit is not so facially deficient or so lacking in indicia of probable cause that the executing officers could not reasonably presume it to be valid. As such, suppression is not appropriate because the so-called "good faith" exception

9

applies. See United States v. Leon, 468 U.S. 897, 923 (1984).

**C. Warrant Execution**

Defendant's third argument is that when the agents learned Heinecke and not Spinks was the current resident of 19 Sylvan Street, they should have immediately ended their search and sought a new warrant.

The First Circuit has not yet addressed the constitutional standards that apply when police officers conducting a search learn new information that alters the probable cause analysis. This problem was first tangentially addressed by the Supreme Court in Maryland v. Garrison, 480 U.S. 79 (1987). In Garrison, police officers executed a warrant authorizing them to search "the premises known as 2036 Park Avenue third floor apartment," which they believed was the home of a man named McWebb. Id. at 80. The officers believed the entire third floor of the building was a single apartment; but halfway through their search, they realized there were two apartments on the third floor, and that they were in fact searching the wrong one. The Court observed that "as the officers recognized, they were required to discontinue the search of respondent's apartment as soon as they discovered that there were two separate units on the third floor and therefore were put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant." Id. at 87.

In Garrison, the officers learned unequivocally that they were searching an apartment outside the intended scope of the warrant, and so they were required to stop immediately. Subsequent cases have presented more difficult questions. In United States v. Marin-Buitrago, 734 F.2d 889 (2d Cir. 1984), police officers were investigating

10

an individual whom they believed to be a drug dealer named Caesar Correa. Based on their observation of that individual, and on separate information about Caesar Correa, they obtained a warrant to search the individual's apartment. In fact, the individual they were following was a different man named Jorge Marin-Buitrago. Before searching his apartment, the officers stopped Marin-Buitrago and addressed him as "Correa"; he informed them that they had the wrong name, and produced a Colombian military identification in the name Marin-Buitrago. The officers nevertheless searched his apartment without seeking a new warrant.

In Marin-Buitrago, unlike Garrison, the apartment the officers searched was within the intended scope of the warrant; but the officers had learned new information potentially undermining the warrant's probable cause. The Second Circuit held that under these circumstances, "when a definite and material change has occurred in the facts underlying the magistrate's determination of probable cause, it is the magistrate, not the executing officers, who must determine whether probable cause still exists." Id. at 894. It defined whether new information was "material" by whether it "cast doubt on the existence of probable cause," and cautioned that "[t]he omitted information and the information in the affidavit must be considered as a whole in determining if probable cause continues to exist." Id. at 895. On the facts before it, the Second Circuit decided the officers' new information would not affect the probable cause finding, and so affirmed the denial of Marin-Buitrago's motion to suppress.

Other circuits considering cases like Marin-Buitrago have adopted a similar standard. See United States v. Perez, 484 F.3d 735, 744 (5th Cir. 2007) (denying

11

suppression because "even in light of the new information . . . probable cause still existed"); United States v. Bowling, 900 F.2d 926, 933-34 (6th Cir. 1990) (denying suppression because "a netural [sic] magistrate would have determined that probable cause existed" even given the new information).

Here, as in Marin-Buitrago and the other cases cited, the area the agents searched was within the intended scope of the warrant. The warrant specifically authorized a search of 19 Sylvan Street. That address was in fact the property physically described in the warrant and listed by Spinks as his residence with the Registry of Motor Vehicles, and was likewise the property to which agents followed Spinks after the suspected drug transaction. But in executing the warrant, the agents learned some information potentially undermining the probable cause for the warrant: that 19 Sylvan Street was not in fact Spinks' residence. The question is whether the new evidence "cast doubt on the existence of probable cause," Marin-Buitrago, 734 F.2d at 895, such that the officers were required to obtain a new warrant.

The answer is no. When the officers entered 19 Sylvan Street, they immediately discovered Heinecke and Spinks together in the kitchen, along with two clear plastic bags of marijuana on the kitchen counter and a black plastic trash bag containing several pounds of marijuana on the floor.[3] These facts overwhelmingly supported the magistrate's initial finding that there was probable cause to believe evidence of Spinks' drug dealing would be found at 19 Sylvan Street. Furthermore, when Heinecke

---

[3] Although the testimony at the evidentiary hearing was not entirely clear, I find as a matter of fact that the agents became aware of the marijuana in the kitchen before learning that Heinecke and not Spinks was residing at 19 Sylvan Street.

informed the agents that he resided at 19 Sylvan Street and produced the lease, the agents also learned several other facts weighing in favor of probable cause: that Spinks continued to own the premises, that Heinecke had only resided there for a month, and that Heinecke was residing there on April 13, 2011, when Spinks allegedly brought forty pounds of marijuana to the house. Those facts all make it probable that Spinks might have left drug-related records or other evidence at the house even after moving out.

This would be a very different case if Heinecke had met the agents at the door, immediately informed them that 19 Sylvan Street was his residence, and produced the lease to confirm his statement. Under those circumstances, given the changed probable cause calculus, the agents would have been well advised to return to the issuing magistrate and seek a new warrant before searching. This would also be a different case if instead of finding Spinks and marijuana in the kitchen, the agents had only found evidence of some other crime—say, a missing murder weapon—before learning Heinecke was the current resident. Under those circumstances, too, the agents would have been well advised to seek a new warrant before searching further, because in that scenario the new evidence would not confirm the theory of probable cause <u>previously presented to the magistrate</u>. <u>Cf.</u> <u>Garrison</u>, 480 U.S. at 87 (merely finding contraband in an apartment outside the scope of the warrant did not authorize officers to continue searching that apartment).

But under the facts presented here, by the time Heinecke informed the agents that 19 Sylvan Street was his residence and not Spinks', the agents had learned a

13

significant amount of new information. Taken as a whole, that new information did not cast doubt on the magistrate's initial finding of probable cause to believe that evidence of Spinks' drug dealing would be found at 19 Sylvan Street. Indeed, the new information emphatically confirmed the magistrate's initial finding. The agents therefore were not required to seek a new warrant, and the motion to suppress must be denied. See Perez, 484 F.3d at 744; Bowling, 900 F.2d at 934; Marin-Buitrago, 734 F.2d at 895.[4]

### D. Staleness

Finally, defendant argues that the warrant affidavit was stale because the last observation of Spinks at 19 Sylvan Street occurred on April 13, 2011, a week before the warrant was issued and executed on April 20, 2011. This argument fails. In evaluating staleness, the court considers "the nature of the information, the nature and characteristics of the suspected criminal activity, and the likely endurance of the information." United States v. Morales-Aldahondo, 524 F.3d 115, 119 (1st Cir. 2008). Here, the agents personally observed Spinks going directly to 19 Sylvan Street after a suspected drug transaction. They believed 19 Sylvan Street was his residence, and suspected him of storing drugs or drug-related evidence there. Because drug dealers are likely to store drugs, drug transaction records, or other drug-related materials for more than a week, the magistrate judge surely had a substantial basis for concluding that the agents' week-old observation was not too stale to support probable cause. See Hicks, 575 F.3d at 136 (substantial basis standard); United States v. Widi, 684 F.3d

---

[4] The court therefore need not reach the government's alternative arguments based on the plain view and inevitable discovery doctrines.

216, 221 (1st Cir. 2012) (finding no staleness where an informant reported a marijuana growing operation at the place to be searched three weeks before the warrant issued). Finally, even if the information were stale, the warrant does not so lack indicia of probable cause that the executing officers could not reasonably rely on it. See United States v. Leon, 468 U.S. 897, 923 (1984). Suppression therefore is not appropriate.

**III.     Conclusion**

Defendant's motion to suppress (Docket # 351) is DENIED.

|   |   |
|---|---|
| February 20, 2013 | /s/Rya W. Zobel |
| DATE | RYA W. ZOBEL |
|  | UNITED STATES DISTRICT JUDGE |